Filed 8/19/24  P. v. Sinigur CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VLADIMIR SINIGUR,<br><br>    Defendant and Appellant. | C091622<br><br>(Super. Ct. No. 18FE004949)<br><br><br>ON TRANSFER |

Defendant Vladimir Sinigur committed 18 sex offenses against his daughter and two sons.  Sixteen of those offenses were committed against the daughter, who was six years old when the abuse came to light.  With respect to those crimes, a jury convicted defendant of two counts of sexual intercourse (counts one and three), five counts of oral

copulation (counts five, seven, nine, eleven, and thirteen), one count of sexual penetration (count fifteen), and eight counts of lewd or lascivious conduct with a child under the age of 14 years (counts two, four, six, eight, ten, twelve, fourteen, and sixteen). The remaining two crimes, two counts of lewd or lascivious conduct with a child under the age of 14 years (counts seventeen and eighteen), were committed against the sons, who were four and seven years old when the abuse came to light. The jury found that defendant committed the foregoing crimes against more than one victim within the meaning of the one strike law (Pen. Code, § 667.61).[1] The trial court sentenced defendant to an aggregate indeterminate prison term of 250 years to life.

On appeal, defendant contends (1) the evidence is insufficient to support his convictions for lewd or lascivious conduct with his sons; (2) defendant's convictions for lewd or lascivious conduct with his daughter must also be reversed because they violate section 954, pertaining to the pleading of different offenses and counts; (3) defendant's trial counsel was ineffective in failing to challenge the admission of defendant's police interview under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694];
(4) defendant's trial counsel was ineffective in failing to object to the admission of a pretext conversation between defendant and his wife; (5) the trial court misinstructed the jury regarding unanimity; (6) cumulative prejudice requires reversal; and (7) the trial court committed various sentencing errors.

In an opinion filed February 28, 2023, this court vacated defendant's sentence, remanded the matter for a new sentencing hearing, and otherwise affirmed the judgment. Although this court concluded the trial court had not understood the scope of its sentencing discretion, this court rejected defendant's assertion that the trial court had improperly imposed multiple-victim enhancements under the one strike law where the

---

[1] Undesignated statutory references are to the Penal Code.

2

prosecution had alleged such enhancements at the end of the information rather than count by count. The California Supreme Court thereafter granted review and held the case while it decided *In re Vaquera* (2024) 15 Cal.5th 706 (*Vaquera*). On May 15, 2024, the Supreme Court transferred the matter back to this court with directions to vacate this court's prior decision and reconsider the cause in light of *Vaquera*, which held that the one strike allegation at issue in that case did not provide fair notice that the prosecution was seeking a 25-year-to-life sentence. (*Id*. at pp. 720-725.) As directed, we vacated this court's prior decision and reconsidered the matter.

We now conclude that the information did not provide defendant with adequate notice that the prosecution was seeking more than one enhanced term under the one strike law. We further conclude, however, that the pleading deficiency was harmless.

As for defendant's other contentions, we conclude (1) sufficient evidence supports the convictions for lewd or lascivious conduct with his sons, (2) section 954 was not violated, (3) because defendant's ineffective assistance claim based on an alleged *Miranda* violation assumes a forfeiture that did not occur, we address the merits and find no reversable error, (4) defendant has not established ineffective assistance regarding the pretext conversation, (5) his instructional error claim is forfeited, and (6) there is no cumulative prejudice.

We will vacate defendant's sentence, remand the matter for a new sentencing hearing, and otherwise affirm the judgment.

BACKGROUND

In January 2018, defendant and his wife shared a room with their three children at defendant's parents' house. Defendant and his wife slept on a mattress on the floor. The children slept on a bunk bed, with the daughter on the top mattress and the sons sharing the larger bottom mattress. That month, the older son was seven years old, the daughter turned six years old, and the younger son was four years old.

3

On January 25, while defendant and his wife were having sex, he asked her when she was going to let him "have" the daughter. The wife thought she misheard him and asked what he meant. Defendant responded, "you know exactly what I mean, you know, have sex with her." The wife asked whether he had ever acted on such thoughts. Defendant said he had, and admitted having oral, vaginal, and anal sex with his daughter. When the wife asked defendant how he could do those things, he laughed and acted like she was making a big deal out of it.

The wife waited for defendant to fall asleep and then took the daughter into the bathroom for her bath. During the bath, the wife asked the daughter whether defendant had ever done anything to her that she did not like, and whether he had asked her to keep it a secret. The daughter said defendant "made her suck his tsurka," a Moldovan word for penis.[2] The daughter also said defendant put his penis between her legs and pushed; she told him to stop but he would not stop. The daughter said "stuff like spit would come out" of the end of defendant's penis.

The next day, the wife called defendant's therapist and told her what defendant and the daughter had said. The therapist said she would have to report the abuse. After the wife spoke to the therapist, defendant asked her to go for a drive with him. The wife told defendant she was afraid to go. He promised she would return safely and gave her the car keys so she could drive. They drove to a park, where the wife asked defendant why he did this to the daughter. Defendant said he did not want to do it, the daughter wanted it, so that was why he did it. Defendant said he used to think it was wrong, but then spirits came to him and told him to do it, and he did not think it was wrong anymore.

When defendant and his wife returned home after their drive to the park, four police cars were parked at the house and several officers were inside. One of the officers

---

[2] Defendant and his wife were immigrants from Moldova. During the daughter's forensic interview she also used a Moldovan word for vagina.

had already spoken briefly to the daughter, but she did not initially disclose any sexual abuse. However, the officer asked whether defendant "was being mean" to the daughter, to which she responded that defendant hurt them with a belt, talked mad, and took away toys. Another officer briefly spoke with the sons, who said defendant would get mad and spank them, but both denied that he ever touched their private parts. The officers were conferring about their conversations with the children when defendant and the wife arrived at the house.

The wife entered the house and immediately took the children into the bedroom. Defendant entered the house without acknowledging the presence of the officers. One of the officers asked to speak with him outside. Defendant seemed frustrated but agreed to do so. The officer asked whether he had done anything illegal with his children, to which defendant answered: "By my law, no." When the officer said he was talking about California law, defendant told the officer: "Be specific with me. What are you asking me?" Defendant was then asked whether he sexually abused the children. He denied the allegation. Defendant later said: "I have my kids. And I have my relationship with each one of them the way I want to have the relationship with them. And they have the relationship with me the way they want to have it with me. Simple." He was taken into custody a short time later.

The daughter was interviewed a second time inside the house. During the interview, when the officer asked whether there was anything else defendant did to her, the daughter said: "He wants me to suck him, [penis]." When asked how often that happened, she answered: "A lot." The daughter said this had been happening since she was four years old. She also said it happened on a daily basis. She initially said defendant did not do anything else, but then said she remembered that he also put his penis between her legs and "pushes it." She said it happened two times and began when she was five years old. The daughter said defendant would give her candy afterwards. She also repeated her description of "spittle" coming out of defendant's penis. She

5

further explained that defendant told her: "If [you] tell anyone, . . . I won't like you anymore."

The following month, each child was interviewed by a forensic interview specialist at the Special Assault Forensic Evaluation (SAFE) Center.[3]

During the daughter's SAFE interview, she repeated that defendant "wanted [her] to suck his [penis] and stuff every day" and also gave her candy after she did so. She said this happened 20 times and specifically described four such incidents. Asked about the last time defendant did that, the daughter explained that he called for her to come into the bedroom while everyone else was playing games outside of the room. When she got into the room, defendant told her to lock the door. He got on the bed without pants or underwear on, made her orally copulate him, and gave her candy afterwards. She described ejaculation, much like she did in her previous statements, and said that defendant told her: " 'Don't tell anyone about this "kay." ' " This incident corresponds to count five (oral copulation) and count six (lewd or lascivious conduct).

The daughter then described a different incident that occurred on her birthday, the details of which were almost identical to the incident described *ante*. The second incident corresponds to count seven (oral copulation) and count eight (lewd or lascivious conduct).

A third incident of oral copulation occurred on the daughter's bunk bed at night. As she described it, her mother and brothers were watching something on the daughter's computer on the mattress on the floor when defendant climbed up onto the daughter's bed with her and told her to "suck his [penis]" or he would not give her candy. While she was doing so, one of her brothers asked, "Where is daddy?" Defendant responded: "I'm

---

[3] The children's trial testimony confirmed much of what they said during their SAFE interviews, but also conflicted in various ways. Where relevant to the issues raised on appeal, we describe their trial testimony during the discussion portion of the opinion.

up here. Come on boys go to sleep or I'll slap you." The incident corresponds to count nine (oral copulation) and count ten (lewd or lascivious conduct).

A fourth incident of oral copulation also involved penetration of the daughter's vagina with defendant's finger. The daughter and defendant were alone in the room when defendant first had her orally copulate him and then put coconut oil on his finger and put his finger inside her vagina. The daughter said it hurt, so defendant stopped and let her leave the room. The incident corresponds to count eleven (oral copulation), count fifteen (sexual penetration), and counts twelve and sixteen (lewd or lascivious conduct).

The daughter also described a different incident in which defendant "tickled" her vagina with his tongue and then held her hands and feet down while he penetrated her vagina with his penis. She said it hurt, but this time defendant did not stop. The incident corresponds to count thirteen (oral copulation) and count fourteen (lewd or lascivious conduct), as well as either count one or count three (sexual intercourse) and either count two or count four (lewd or lascivious conduct).[4]

The sons were also interviewed at the SAFE Center. We need not describe their interviews in any detail. It will suffice to note that each boy described physical abuse in the form of beatings, some of which drew blood, along with separate incidents in which defendant "tickled" their penises. The latter incidents correspond to counts seventeen and eighteen (lewd or lascivious conduct).

The day after the SAFE interviews were conducted, the wife spoke with defendant at the jail at the request of Detective Lindsey Lamb. The conversation was recorded.

---

[4] The other sexual intercourse and lewd or lascivious conduct counts were supported by the daughter's previous statement that defendant put his penis between her legs and pushed on two occasions, and defendant's admission that he had sexual intercourse with his daughter at least three times, specifically recalling one other act of sexual intercourse that occurred at a park. We describe those admissions in greater detail, *post*.

During the conversation, when the wife accused defendant of raping the daughter, defendant responded: "You're using words that [are] confusing 'cause that's not true.' " The wife asked: "And what words should I be using? You made love to her?" Defendant answered: "Mm-hm." When the wife repeated the question, in apparent disbelief, defendant responded that it was "none of [her] concern." Defendant gave the same response later in the conversation when the wife asked him how many times he did this to the daughter, adding: "Nothing that happened between me and any woman is . . . your concern." The wife then asked: "Okay, did you do anything to the boy?" Defendant responded: "You can push me and you can find out things that you wanna find out but the consequences of that information on you, you're not gonna like it." When the wife reminded defendant of their previous conversation, specifically that he told her that he "used to think . . . that doing this kind of stuff to kids . . . was not good," but then changed his mind, defendant responded: "I never did anything to kids." The wife asked, "So [our daughter is] an adult?" Defendant responded: "Again, that is not your concern."

Five days later, defendant was interviewed by Detective Lamb. Defendant claimed he viewed the ages of his children differently than their legal ages, explaining: "By my counting [the older son] is, uh, 16, 17. [The daughter] is, uh, 14 and a half, and [the younger son] is, um, 12 and a half [to] 13." When asked whether the daughter orally copulated him, defendant answered: "Yes, she did." Defendant said it happened twice, claiming that it started when she told him " 'I can't wait until I can have you.' " According to defendant, he was "really against all that stuff" at the time, so he told her it would never happen. Then "spirits entered [him] and her and confused [him] and things started happening." When the detective asked what else happened, defendant admitted having oral, vaginal, and anal sex with his daughter. When asked how many times, defendant answered: "Three times maybe, four times, I'm not really sure, five times. I can't count." Defendant claimed these sex acts with his daughter were consensual. He

8

also said that in addition to sex acts that occurred at the house, he had sexual intercourse with the daughter on one occasion at a park. Defendant also admitted giving her candy after various sex acts, but claimed he did not remember that being a reason she engaged in the acts with him. Defendant also confirmed the daughter's account of him using coconut oil as a lubricant, and confirmed placing his tongue on her vagina on one occasion.

Detective Lamb asked defendant whether anything happened between him and his sons. Defendant answered: "The only thing is I think I might have taught them how to, uh, how to play with their penis." Asked how he did so, defendant explained: "Just how it went. How to jac–how to ejaculate but they never ended up doing it. So I just taught them how to play with it, make it go hard pretty much." When the detective asked what he "explained to them," defendant answered: "I didn't explain nothing. I just did it for them once that's all." Detective Lamb asked whether defendant used his hand. Defendant said he did. The detective then asked: "And what did you do?" Defendant responded: "Just play with it." Further clarifying, the detective asked: "So you showed [the sons] how to do that using your own hand on their penis?" Defendant answered: "Just how to get their penis obvious." Defendant admitted doing this on one occasion for each of his sons.

## DISCUSSION

### I

Defendant contends the evidence is insufficient to support his convictions for lewd or lascivious conduct with his two sons. We disagree.

The standard of review is well-settled: "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently

9

for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt.  [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict.  [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

The crime of lewd or lascivious conduct requires proof of the following: (1) willful commission of "any lewd or lascivious act"; (2) "upon or with the body, or any part or member thereof, of a child who is under the age of 14 years"; (3) "with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] or the child" (§ 288, subd. (a)).  " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' [Citation.]  By focusing on the defendant's intent to sexually exploit a child rather than on the nature of the defendant's offending act, section 288 'assumes that young victims suffer profound harm whenever they are perceived and used as objects of sexual desire.' [Citation.]" (*People v. Shockley* (2013) 58 Cal.4th 400, 404.)

As an initial basis for challenge, defendant claims there is insufficient evidence that he improperly touched the boys at all.  We conclude the evidence is more than sufficient to prove this element of the offense.  Both boys stated in their SAFE interviews that defendant tickled their penises.  They also testified at trial that this happened.  In addition, defendant admitted touching the boys' penises during his interview with Detective Lamb, explaining that he taught them how to play with their penis in order to ejaculate.  When asked how he taught them this, defendant admitted he did it for them using his hand.  When the detective tried to clarify whether defendant showed his sons how to do that using defendant's hand on their penis, defendant did not dispute that description of what happened, adding:  "Just how to get their penis obvious."

10

Defendant argues he might have been talking about teaching the boys how to masturbate by touching his own penis. It is true defendant did not expressly confirm the detective's characterization of him touching the boys' penises with his hand. However, as mentioned, defendant did not deny it or dispute it, and the boys confirmed that defendant touched their penises. Viewing the evidence as a whole, as we must, a reasonable jury could have concluded beyond a reasonable doubt that defendant touched each boy's penis in order to show them how to masturbate.

Defendant claims he and the sons were talking about different touchings because tickling is not the same as demonstrating masturbation. But the evidence indicates each son interpreted the masturbation demonstration as tickling. A reasonable jury could have concluded defendant and his sons were talking about the same conduct.

As an additional basis for his insufficient evidence challenge, defendant argues there is insufficient evidence that he possessed the requisite sexual intent. He again focuses on the boys' descriptions of tickling to assert that the conduct was not sexual. But defendant described the conduct as teaching his sons how to play with their penises in order to ejaculate. Of course, the jury also heard the evidence relating to defendant's conduct with his daughter, which further supported a conclusion that defendant possessed a sexual intent when touching his sons' penises. There is sufficient evidence to satisfy the sexual intent requirement of section 288, subdivision (a).

Defendant's convictions in counts seventeen and eighteen are supported by substantial evidence, as is the finding that defendant committed crimes against more than one victim within the meaning of the one strike law.

## II

Defendant also claims his convictions for lewd or lascivious conduct with his daughter must be reversed because they violate section 954, which pertains to the pleading of different offenses and counts. Specifically, he argues the convictions were based on the same acts as his convictions for other sex crimes, i.e., sexual intercourse,

11

oral copulation, and sexual penetration, and the Legislature did not intend to define separate offenses when it defined the crime of lewd or lascivious conduct and these other more specific sex offenses.

Section 954 provides in relevant part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts . . . . The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged . . . ."

The California Supreme Court has "repeatedly held that the same act can support multiple charges and multiple convictions. 'Unless one offense is necessarily included in the other [citation], multiple convictions can be based upon a single criminal act or an indivisible course of criminal conduct (§ 954).' [Citation.] Section 954 thus concerns the propriety of multiple convictions, not multiple punishments, which are governed by section 654." (*People v. Gonzalez* (2014) 60 Cal.4th 533, 537 (*Gonzalez*).)

For example, in *Gonzalez*, the Supreme Court held that section 954 was not violated where the defendant was convicted of both oral copulation of an intoxicated person and oral copulation of an unconscious person based on the same act of oral copulation. (*Gonzalez, supra*, 60 Cal.4th at p. 535.) The court first explained that whether these were separate offenses or rather different ways of committing the same offense turned on the Legislature's intent in enacting former § 288a, subdivisions (f) and (i). (*Gonzalez,* at p. 537.) The court then analyzed the statutory language and explained that the conduct defined to be criminal in each subdivision was not necessarily included in the other because "an act of oral copulation may be committed with a person who is unconscious but not intoxicated, and also with a person who is intoxicated but not unconscious." (*Id*. at p. 539.) The court further explained that each subdivision of former section 288a "sets forth all the elements of a crime, and each prescribes a specific

12

punishment." (*Gonzalez,* at p. 539.) The court concluded: "That each subdivision of [former] section 288a was drafted to be self-contained supports the view that each describes an independent offense, and therefore section 954 is no impediment to a defendant's conviction under more than one such subdivision for a single act." (*Ibid*.)

Here, defendant was convicted of two counts of sexual intercourse (counts one and three) and two counts of lewd or lascivious conduct (counts two and four) based on the same two acts. Defendant was also convicted of five counts of oral copulation (counts five, seven, nine, eleven, and thirteen) and five counts of lewd or lascivious conduct (counts six, eight, ten, twelve, and fourteen) based on the same acts. Finally, his convictions for sexual penetration (count fifteen) and lewd or lascivious conduct (count sixteen) were also based on the same act. The question is whether the Legislature intended to define a separate offense when it enacted section 288, defining the crime of lewd or lascivious conduct, or rather intended this section to merely be a different way of committing the crimes of sexual intercourse, oral copulation, or sexual penetration of a child, defined in section 288.7.

The answer can be found in the language of section 288, subdivision (a), which states in relevant part, "a person who willfully and lewdly commits any lewd or lascivious act, *including any of the acts constituting other crimes* provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years." (Italics added.) The statute specifically states that the commission of "other crimes" may also constitute the crime of lewd or lascivious conduct. (§ 288, subd. (a).)

Section 288.7 defines such other crimes: "(a) Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison

for a term of 25 years to life.  [¶]  (b) Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

The crimes defined by sections 288 and 288.7 are not necessarily included within each other because an act of sexual intercourse, oral copulation, or sexual penetration with a child who is 10 years of age or younger may be committed without the specific intent required by section 288,[5] and conversely, a lewd or lascivious act need not be any of the specific acts set forth in section 288.7, but may be a seemingly innocuous touching if accompanied by the requisite intent.  Moreover, as in *Gonzalez*, each subdivision at issue here (§ 288, subd. (a), § 288.7, subds. (a), & (b)) "sets forth all the elements of a crime, and each prescribes a specific punishment."  (*Gonzalez, supra*, 60 Cal.4th at p. 539.)  The crime of lewd or lascivious conduct is also defined in a separate section, as opposed to a separate subdivision of the same section, providing further support for our conclusion that it is a "self-contained" offense.  (*Ibid*.)

---

[5] The crimes of sexual intercourse and oral copulation set forth in section 288.7 do not require any specific intent at all.  (See *People v. Saavedra* (2018) 24 Cal.App.5th 605, 613 [oral copulation in violation of § 288.7, subdivision (b) is a general intent crime].)  The crime of sexual penetration does require a specific intent.  This is because it incorporates the definition of "sexual penetration" set forth in section 289, subdivision (k)(1) of which requires the sexual penetration to have been "for the purpose of sexual arousal, gratification, *or abuse* . . . ."  (§ 289, subd. (k)(1), italics added; see also *Saavedra,* at p. 613.)  Thus, while lewd or lascivious conduct in violation of section 288, subdivision (a) requires a specific intent "of arousing, appealing to, or gratifying the lust, passions, or sexual desires of [the defendant] person or the child" (§ 288, subd. (a)), sexual penetration in violation of section 288.7, subdivision (b) can be violated with an abusive rather than an arousing or gratifying intent.  (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1538 ["the crime of unlawful sexual penetration requires the specific intent to gain sexual arousal or gratification *or to inflict abuse on the victim*," italics added].)

14

For the foregoing reasons, we conclude section 954 does not prohibit multiple convictions for lewd or lascivious conduct in violation of section 288, subdivision (a) and the other crimes set forth in section 288.7, subdivisions (a) and (b) based on the same physical act.

III

Defendant further asserts that his trial counsel was ineffective in failing to challenge the admission of defendant's police interview on the ground that Detective Lamb did not obtain a valid waiver of defendant's *Miranda* rights. This ineffective assistance claim *assumes* a forfeiture, but we conclude the matter was not forfeited. Defendant's trial counsel specifically argued to the trial court that defendant's psychiatric condition prevented a knowing and intelligent waiver of his *Miranda* rights. Because we think that argument preserved the contention raised in this appeal, we will address the merits of whether defendant waived his *Miranda* rights.

A

At the start of Detective Lamb's interview with defendant, she fully and accurately advised him of his *Miranda* rights. Before doing so, she also told defendant "when I've read you your rights if you don't understand them or have any questions about 'em just let me know and I'll clarify, okay?" After the *Miranda* advisement, defendant did not indicate a lack of understanding and did not ask for clarification. Detective Lamb then informed defendant she was there to speak to him about a case involving his daughter and asked whether he knew what it was about. Defendant answered: "Yes, I've been informed." The interview continued from there.

We have already provided a summary of defendant's admissions during the interview. For present purposes, we add that defendant's first language was Moldovan, but he spoke fluent English and stated that he studied English in school when he moved to the United States in 2007. During the interview, defendant seemed to fully understand the detective's questions. But some of his statements suggested delusion. For example,

15

when asked about his relationship with his daughter, defendant explained that a group of people approached him during his "spiritual growth," and told him that he was "very delicious and they wanted to eat [him]." Defendant continued: "I couldn't say no. I–for some reason the law in me was used somehow used to take that away from me. And I said, yes, but they cut my body apart. They ate it all. And after that there was again a spiritual rule but by myself then. There was nobody there. But I had the power that nobody else had, you know, I was able to torment people. So–and when I found the person that was responsible for that and I tormented them until they build me another body." Defendant continued in a similar manner until redirected to a specific question about the allegations of sexual abuse. He answered that question, and follow-up questions, clearly and concisely.

Defendant filed an in limine motion seeking, among other things, to exclude his police interview pursuant to *Miranda*. The prosecution opposed the motion, arguing that Detective Lamb properly advised defendant of his *Miranda* rights and defendant waived those rights by talking to her about the case.

At the hearing on the motion, defense counsel referenced records from a psychiatric appointment defendant had about a month before his interview with Detective Lamb. Defense counsel described the records as indicating that defendant had a previous diagnosis of bipolar disorder, presented with "confusing cognitive functioning" and thinking that was both "delusional and . . . paranoid," and "he would be further assessed for psychosis." Defense counsel also noted defendant "had not been taking psychotropic medications for two months" prior to the appointment, "believed that people on the TV and on the radio [were] talking to him," among other delusional thoughts, and also had a chemical imbalance. Defense counsel represented that defendant returned for a second psychiatric visit two days later, during which his wife said defendant "had not been sleeping" and was "saying things that do not make any sense at all as if he was speaking

16

to a computer." The person who saw defendant noted that he "exhibited delusional thought content."

Defense counsel argued defendant's psychiatric symptoms prevented a knowing and intelligent *Miranda* waiver. In addition, defense counsel correctly noted that the trial court should assess whether there was a knowing and intelligent *Miranda* waiver by looking at the totality of the circumstances.

The prosecutor explained that the second psychiatric appointment was the same day that the police spoke to defendant about the allegations of abuse. The prosecutor argued that despite the diagnoses and behaviors, defendant was able to answer the questions posed to him by officers and assert denials when he felt he was being accused of something he did not do. The prosecutor also noted that defendant chose to end the police questioning at his house. The prosecutor referenced *Colorado v. Connelly* (1986) 479 U.S. 157, 170 [93 L.Ed.2d 473] (*Colorado*), in which a delusional defendant felt compelled by "the 'voice of God' " to confess to a murder and the United States Supreme Court held the defendant's waiver of his *Miranda* rights was not involuntary. Turning to the interview with Detective Lamb, the prosecutor said he spoke of two different worlds -- his world and the world for everyone else -- but he understood both worlds. For example, he viewed his children's ages differently than their actual ages, but seemed to understand that his calculations were not the same as the rest of the world. The prosecutor said the detective asked certain questions to confirm that defendant continued to have situational awareness. The prosecutor argued "defendant understood what conversation he was having and who he was having it with, and if the defendant was able to understand that, then I think it would logically follow . . . that [he] understood what he was doing when he waived his *Miranda* rights and proceeded to talk to the officer and engage in the interview . . . ."

Defense counsel countered that defendant's descriptions of different worlds and calculations of time was evidence of psychosis or delusion.

17

The trial court issued a ruling from the bench, concluding that defendant understood and waived his *Miranda* rights and also made knowing, intelligent, and voluntary statements to law enforcement. The trial court's conclusion was based on its review of the entire interview and defendant's mental health records, including jail psychiatric records indicating defendant had been thinking and acting rationally closer to the time of the interview with Detective Lamb,[6] along with the fact that defendant was no stranger to the criminal justice system.

B

"The rule the [United States Supreme] Court established in *Miranda* is clear. In order to be able to use statements obtained during custodial interrogation of the accused, the State must warn the accused prior to such questioning of his right to remain silent and of his right to have counsel, retained or appointed, present during interrogation." (*Fare v. Michael C.* (1979) 442 U.S. 707, 717 [61 L.Ed.2d 197].) "*Miranda* further recognized that after the required warnings are given the accused, '[i]f the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' [Citation.]" (*Id*. at p. 724.) "[A] valid waiver of *Miranda* rights may be express or implied." (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 218 (*Sauceda-Contreras*).)

Here, defendant's trial counsel did not contend that Detective Lamb's *Miranda* advisement was deficient, that there was any police coercion, or that defendant's

---

[6] The trial court's observations about the jail psychiatric documents are supported by the record. Two reports from February 13 and February 15, 2018, about two weeks before defendant's interview with Detective Lamb, indicate defendant was oriented to person, place, date, situation, and his thought processes were intact and coherent.

18

statements were involuntary.  The issue is whether defendant made a knowing and intelligent implied waiver of his *Miranda* rights.  While "courts must presume that a defendant did not waive his rights[,] . . . in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." (*North Carolina v. Butler* (1979) 441 U.S. 369, 373 (*Butler*).)  This question "must be determined on 'the particular facts and circumstances surrounding [the] case, including the background, experience, and conduct of the accused.' [Citations.]" (*Id*. at pp. 374-375; see also *People v. Cruz* (2008) 44 Cal.4th 636, 668 (*Cruz*).)  "Although we independently determine whether, from the undisputed facts and those properly found by the trial court, the challenged statements were illegally obtained [citation], we ' "give great weight to the considered conclusions" of a lower court that has previously reviewed the same evidence.' [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 236.)  The knowing and intelligent nature of such a waiver need only be established by a preponderance of the evidence.  (*Ibid*.)

Defendant argues he did not knowingly and intelligently waive his *Miranda* rights because he never said he did.  But defendant was not required to expressly inform the detective that he knowingly and intelligently waived his rights.  Although there are cases in which a defendant expressly indicated an understanding of rights (see *Butler, supra*, 441 U.S. at pp. 370-371; *Sauceda-Contreras, supra*, 55 Cal.4th at p. 206; *Cruz, supra*, 44 Cal.4th at p. 666; *People v. Whitson* (1998) 17 Cal.4th 229, 245; *People v. Sully* (1991) 53 Cal.3d 1195, 1233), those cases did not hold that such an affirmative expression of understanding is required.  Here, the question is whether defendant made an implied knowing and intelligent waiver based on the totality of the circumstances.

Defendant notes that English is not his first language.  He claims the transcript is full of instances in which he did not understand a question.  But the transcript and audio of the interview disclose no language barrier between Detective Lamb and defendant during the interview.  As the trial court observed, defendant speaks very good English,

and Detective Lamb specifically asked defendant if he had any problem understanding what they were talking about. She told him to ask her to clarify if there was anything he did not understand. He did not indicate there was any lack of understanding at that point. Later in the interview, when defendant did not understand a question, he followed the detective's instruction and asked for clarification. For example, when asked about the daughter's allegations of child molestation, defendant said he did not know what child molestation was. The detective asked if the daughter had alleged oral copulation, "meaning that she sucked your penis." Defendant replied: "Yes, she did."

In addition, defendant contends there was no knowing and intelligent waiver because he had a mental condition and gave responses that were delusional or did not make sense. But delusions do not *necessarily* render a waiver of *Miranda* rights unknowing and unintelligent. (Cf. *Colorado, supra*, 479 U.S. at p. 170 [delusions did not necessarily render a waiver involuntary].) We must view defendant's statements in the context of the entire interrogation.

After defendant made the comment about his children's ages, the detective asked whether he had any medical issues. Defendant said his body was "jumped" prior to his birth and implanted with metal. The detective then asked a series of questions to determine he knew where he was. Defendant answered the questions correctly. Although defendant said the year was 2028 by *his* counting, he knew the year was actually 2018. Defendant said he had gone to a psychiatric facility after threatening to harm his children. He then answered more questions about his life and living situation, after which the questions shifted to the allegations of sexual abuse. As mentioned, defendant asked the detective to clarify the meaning of child molestation. We have already described defendant's admissions, including that he engaged in oral, vaginal, and anal sex with his daughter between three and five times. Although defendant made some odd statements, our review of the interview indicates he understood the detective's

20

questions and provided direct and coherent answers to her specific questions about the abuse.

The record supports the trial court's finding that defendant made an implied knowing and intelligent waiver of his *Miranda* rights.

IV

Defendant further claims his trial counsel was ineffective in failing to object to the admission of the pretext conversation between defendant and his wife.

As previously mentioned, Detective Lamb facilitated a pretext conversation between the wife and defendant at the jail. While the conversation was in-person, a glass partition separated defendant and his wife, with communication through telephones on each side of the glass. At the start of the call, defendant was informed that the conversation would be recorded. We have already set forth the relevant content of the conversation.

Defendant did not object in the trial court to the admission of the conversation, forfeiting a direct challenge to its admission in this appeal. (See *People v. Quiroz* (2013) 215 Cal.App.4th 65, 78.) Defendant nevertheless contends his trial counsel was deficient in failing to object on the ground that defendant's statements were involuntarily obtained by an agent of the police.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to effective assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his

21

"representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (2021) 11 Cal.5th 842, 854-855 & fn. 5; see *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674].)

Defendant has not established that his counsel was deficient. Had counsel objected to the pretext conversation on the ground that it was involuntary, the prosecution would have been tasked to establish by a preponderance of the evidence that defendant's statements in the conversation were voluntary and not obtained as a result of police coercion. (*People v. Massie* (1998) 19 Cal.4th 550, 576; *People v. Maury* (2003) 30 Cal.4th 342, 404.) Courts apply a totality of the circumstances test to determine the voluntariness of a statement; the question is whether defendant was not free to make the statement because his will was overborne. (*Massie,* at p. 576.) "A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*Maury,* at p. 404.)

The totality of the circumstances surrounding the conversation does not reveal any threats, promises, improper influence, or coercive conduct. Defendant argues he was subjected to emotional pressure from his wife, such as asking him whether he wanted to get help in order to be a family again, telling him their daughter was having dreams about him apologizing to her but she did not believe him, and asking defendant whether he felt any remorse for raping his daughter. But defendant cites no authority that comments like those made by his wife constitute improper influence or coercion, and we have not found any.

22

Defendant nevertheless argues his wife and the detective took advantage of defendant's mental illness. However, as with his police interview, our review of the pretext conversation reveals that defendant was able to intelligently engage in conversation with his wife notwithstanding his mental health issues.

We conclude any objection to the admission of the pretext conversation on grounds that defendant's statements were involuntary would have failed, and counsel is not deficient for failing to bring a meritless challenge to admissible evidence. (*People v. Hart* (1999) 20 Cal.4th 546, 629.) Defendant has not established ineffective assistance.

V

Defendant also claims the trial court prejudicially erred and violated his federal constitutional rights by omitting essential wording from CALCRIM No. 3501 regarding the requirement of unanimity.

Defendant did not object to the instruction at trial. "Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights. [Citations.] The question is whether the error resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 . . . ." (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

We conclude there was no miscarriage of justice. The jury was instructed: "The defendant is charged with numerous acts of child molestation against [the daughter] and one count of child molestation against [the older son] [¶] The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless: [o]ne, you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed; or [two,] you all agree that the People have proved that the defendant committed all the acts alleged to have occurred."

Defendant argues: "The first option should have included the following italicized language: 'You all agree that the People have proved that the defendant committed at

least one of these acts and you all agree on which act he committed *for each offense*.' (CALCRIM No. 3501, brackets omitted.) Without the italicized words, the court's instruction allowed the jurors to bypass the requirement that they unanimously agree on which act [defendant] committed for each count, and instead only agree that he committed at least one of the alleged acts."

While we agree with defendant that the challenged instruction should have included "for each offense," we are not persuaded that the jury would have read the entire charge in the manner he asserts on appeal. "The correctness of jury instructions is determined from the entire charge by the trial court and not from consideration of part or parts of an instruction. [Citation.] We assume the jurors are intelligent persons capable of understanding and correlating all jury instructions given them." (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 649.) "[T]he question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts." (*People v. Kelly* (1992) 1 Cal.4th 495, 525.)

Here, the challenged instruction began by referring to multiple counts and then informed the jury that the prosecution "presented evidence of more than one act to prove that the defendant committed *these offenses*." (Italics added.) The jury was then informed unanimity with respect to which act he committed was required. The omitted "for each offense" language would have made it crystal clear that unanimity is required for each offense. But even without that language, a reasonable jury would have read the instruction to require unanimity for "these offenses," i.e., each of the multiple offenses referred to at the start of the instruction. Moreover, we must read the challenged instruction together with CALCRIM No. 3515, which followed immediately after CALCRIM No. 3501. That instruction informed the jury: "Each of the counts charged in this case is a separate crime. You must consider each count separately and return a separate verdict for each one." Read together, we conclude the jury was likely to have interpreted CALCRIM No. 3501 correctly.

24

Because there was no miscarriage of justice, defendant's substantial rights were not affected, and his contention is forfeited.

VI

In addition, defendant contends cumulative prejudice requires reversal. We conclude there is no prejudice to cumulate.

VII

Defendant asserts five claims of sentencing error. We need address only two of the contentions: (A) that all but one of the multiple-victim sentence enhancements must be vacated because the prosecution only alleged the enhancement as to one count, and (B) that the matter must be remanded for a new sentencing hearing because the trial court did not understand it had discretion to sentence defendant to concurrent as opposed to consecutive terms of imprisonment.

A

Defendant contends that all but one of the multiple-victim sentence enhancements must be vacated because the prosecution only alleged the enhancement as to one count.

"California's [one strike] law, codified at [section 667.61], is an alternative sentencing scheme that applies when the prosecution pleads and proves specific aggravating circumstances in connection with certain sex offenses." (*Vaquera, supra*, 15 Cal.5th at p. 712.) The prosecutor has discretion whether to plead a one strike allegation. (*Id*. at pp. 714-715.) "When the prosecution is pursuing sentencing under the [o]ne [s]trike law, the jury decides first whether the prosecution has proved the elements of the charged offense; if the jury convicts, it then independently considers whether the prosecution has proved the circumstances alleged to support sentencing under the [o]ne [s]trike law." (*Id*. at p. 713.) If the jury finds the one strike allegation to be true, "the offense generally will be punishable by an indeterminate sentence of either 15 years to life or 25 years to life," depending on which provision of the one strike law was alleged to apply. (*Ibid*.; see, e.g., § 667.61, subd. (a) [25 years to life if the sex offense was

25

committed under one or more circumstances specified in subdivision (d) or two or more circumstances specified in subdivision (e)]; § 667.71, subd. (b) [15 years to life if the sex offense was committed under one of the circumstances specified in subdivision (e)].) If the jury does not find the one strike allegation to be true, the usual determinate sentence for the sex crime applies. (*Vaquera, supra*, 15 Cal.5th at p. 713.)

As relevant here, "[a] person who is convicted of [an enumerated sex offense] under one of the circumstances specified in subdivision (e), [including the circumstance that such an offense was committed in the present case against more than one victim,] upon a victim who is a child under 14 years of age, shall be punished by imprisonment in the state prison for 25 years to life." (§ 667.61, subd. (j)(2); see also § 667.61, subd. (e)(4).) This specific one strike allegation, citing to section 667.61, subdivision (j)(2), was asserted at the end of the information and was found true. Based on this finding, the trial court imposed multiple one strike terms of 25 years to life, applying the finding to each qualifying count even though it was not pled on a count-by-count basis.

Defendant does not challenge the finding itself, but instead argues "the prosecution pled the multiple-victim enhancement only after Count [eighteen], creating a reasonable inference that it was only seeking one 25-to-life enhancement," as opposed to multiple enhanced terms of 25-to-life for each conviction subject to the one strike sentencing scheme. This court's initial opinion rejected the argument, concluding that a one strike allegation did not need to be pled on a count-by-count basis because it is not an enhancement, it sets forth an alternative sentencing scheme for certain sex crimes.

We have now reconsidered that conclusion in light of *Vaquera*. In that case, the defendant challenged a one strike sentence of 25 years to life imposed for one of his qualifying convictions. The one strike allegation was asserted under section 667.61, subdivision (b), providing for an indeterminate term of 15 years to life if the sex offense was committed under one of the circumstances specified in subdivision (e), including the

multiple-victim circumstance. (*Vaquera, supra*, 15 Cal.5th at p. 714.) The one strike allegation "did not include a citation to [section 667.71,] subdivision (j)(2)" or "specify that the victim was under 14 years old." (*Ibid*.) Nevertheless, because the victim was in fact under 14 years old, the trial court utilized section 667.71, subdivision (j)(2) and sentenced the defendant to 25 years to life for that conviction. (*Vaquera,* at p. 715.) On habeas corpus review, the Court of Appeal rejected the defendant's argument that he did not receive fair notice that the prosecution was seeking a sentence of 25 years to life for that conviction. (*Id*. at p. 716.)

The California Supreme Court reversed. Relying on *People v. Anderson* (2020) 9 Cal.5th 946 (*Anderson*), the court analogized one strike allegations to enhancement allegations and explained: "[A] '[o]ne [s]trike allegation exposes a defendant to greater punishment than would be authorized by a verdict on the offense alone.' [Citation.] Without a true finding on a [o]ne [s]trike allegation, the court may not apply the lengthier sentences provided for in the [o]ne [s]trike law. [Citations.] Accordingly, we have held the prosecution must provide the defendant 'fair notice of the qualifying statutory circumstance or circumstances that are being pled, proved, and invoked in support of [o]ne [s]trike sentencing.' [Citation.]" (*Vaquera, supra*, 15 Cal.5th at p. 718.) "[T]o satisfy due process, an accusatory pleading must inform the defendant that the prosecution is relying on specific facts to support imposition of a particular [o]ne [s]trike sentence." (*Id*. at p. 719.) The court held that the one strike allegation pled with respect to the particular count at issue did not satisfy this standard because the language of the allegation "suggest[ed] the prosecution was seeking a sentence of 15 years to life" for that count. (*Id*. at p. 721.) The court explained: "[T]he prosecution had the choice of: (1) not including a [o]ne [s]trike allegation in the information and seeking a determinate sentence of three, six, or eight years [citation]; (2) seeking 15 years to life based on the multiple victim circumstance alone [citation]; or (3) seeking 25 years to life based on the additional circumstance that the victim of count 2 was under the age of 14 [citation].

27

The information appears to reflect that the prosecution chose the middle ground, alleging a [o]ne [s]trike law circumstance, citing to [section 667.71,] subdivisions (b) and (e), and including a corresponding multiple-victim factual allegation, while omitting any citation to [section 667.71,] subdivision (j)(2) and any corresponding allegation that the victim was under the age of 14." (*Ibid.*)

Here, unlike in *Vaquera*, the one strike allegation did invoke section 667.71, subdivision (j)(2). Defendant was therefore given fair notice that the prosecution was seeking a sentence of 25 years to life under that provision. However, the prosecution pled the one strike allegation only once, not with respect to each count. *Vaquera* clarifies that one strike allegations are analogous to enhancement allegations for purposes of due process notice requirements. Moreover, as with sentence enhancements, the prosecution has discretion to seek application of the one strike law with respect to individual counts. The prosecution must therefore provide a defendant with fair notice that it is seeking one strike sentencing with respect to each count. (*People v. Perez* (2015) 240 Cal.App.4th 1218, 1225; *Anderson, supra*, 9 Cal.5th at p. 957 ["accusatory pleading must adequately inform the defendant as to how the prosecution will seek to exercise its discretion"].) By pleading the one strike allegation only once, without including language indicating that the allegation applied to multiple counts, the prosecution did not provide defendant with adequate notice that it was seeking a sentence of 25 years to life for more than one count.

This conclusion does not end the inquiry, however. Such a pleading defect does not result in an unauthorized sentence that must be stricken regardless of the individual circumstances of the case. (*Anderson, supra*, 9 Cal.5th at p. 962.) For example, in *People v. Houston* (2012) 54 Cal.4th 1186 (*Houston*), "a capital defendant contended he was improperly sentenced to life imprisonment for attempted murder, in addition to his death sentence, because the indictment failed to allege that the attempted murders were willful, deliberate, and premeditated." (*Anderson,* at p. 962.) The California Supreme Court held that the defendant forfeited this contention because the trial court, during the

28

trial's evidentiary phase, specifically informed the defendant that he was facing life imprisonment for attempted murder and "asked the parties to say if there was a problem with the proposed jury instructions and verdict forms." (*Houston,* at pp. 1227.) Defendant did not object. He also did not object when the jury was instructed to determine whether the attempted murders were willful, deliberate, and premeditated, or when the jury was given the verdict forms. (*Ibid.*) The Supreme Court explained: "Had defendant raised a timely objection to the jury instructions and verdict forms at any of these stages of the trial on the ground that the indictment did not allege that the attempted murders were deliberate and premeditated, the court could have heard arguments on whether to permit the prosecutor to amend the indictment. [Citation.] If the trial court was inclined to permit amendment, defendant could have requested a continuance to permit him to prepare a defense. [Citation.] On the facts here, defendant received adequate notice of the sentence he faced, and the jury made an express finding that the attempted murders were willful, deliberate, and premeditated. A timely objection to the adequacy of the indictment would have provided an opportunity to craft an appropriate remedy. Because defendant had notice of the sentence he faced and did not raise an objection in the trial court, he has forfeited this claim on appeal." (*Id*. at pp. 1227-1228.)

Similarly, here, on the date set for trial to begin, the prosecutor informed the trial court that defendant was offered a plea that would have resulted in a sentence of 45 years to life, whereas "[h]is exposure in total is 250 years to life." The trial court then asked defendant: "And knowing that your offer is 45 to life, you face a maximum of 250 years to life in state prison, what is your desire?" Defendant declined the offer. The sentence of 250 years to life was only possible if the one strike allegation applied to multiple counts, as the People made clear in their trial brief: "If found true, the effect of the special allegations is to increase the sentencing *on each count charged* to 25 years to life. Thus, Defendant's maximum exposure is 250 years to life." (Italics added.) The prosecutor's closing argument also stated that the jury would be required to determine

29

whether defendant "committed *these offenses* on more than one victim." (Italics added.) The verdict form for the one strike allegation similarly stated: "We, the jury, find the allegation that the defendant . . . committed *the acts alleged* against more than one victim . . . ." (Italics added.) Thus, as in *Houston*, defendant received actual notice of the total sentence he faced. And also like the defendant in *Houston*, defendant did not object when informed that the People sought one strike sentencing with respect to each qualifying count.

The People do not assert forfeiture, perhaps because *Anderson* addressed an analogous claim regarding unpled firearm enhancements notwithstanding forfeiture. (*Anderson, supra*, 9 Cal.5th at p. 963.) But as *Anderson* makes clear, *Houston's* forfeiture analysis is also relevant to whether such a pleading error is harmless. The People assert harmless error on appeal. Rejecting the People's harmless error argument in *Anderson*, the court explained that the defendant received his first indication the prosecution "*might*" seek imposition of multiple unpled firearm enhancements "just before the jury left to deliberate" and did not receive clarification as to the prosecution's "actual intentions regarding the enhancements until midway through the sentencing hearing." (*Id*. at p. 964.) "At that point," the court stated, "the damage was done—it was by then too late to consider the prosecution's pretrial plea deal or reshape his trial strategy. This would be a different case if the prosecution had told [the defendant] from the outset that it planned to seek the [firearm] enhancements as to the robbery counts but for some reason failed to include them in the information." (*Ibid*., citing *Houston, supra*, 54 Cal.4th at pp. 1227-1228.)

Here, as previously stated, defendant was notified of his total exposure and the prosecution's intent to seek multiple one strike sentences before the evidentiary phase of the trial. Defendant was also offered a plea deal that would have resulted in a far lower sentence. He rejected the offer. Pleading requirements are "meant to give sufficient notice to permit the defense to make informed decisions about the case, including

whether to plead guilty, how to allocate investigatory resources, and what strategy to deploy at trial." (*Anderson, supra*, 9 Cal.5th at p. 964.) Unlike in *Anderson*, the actual notice defendant received was not "too late to cure the defective pleading." (*Ibid*.) Indeed, his briefing on appeal does not persuade that he would have done anything differently had the prosecution pled the one strike allegation on a count-by-count basis, or clearly delineated the counts to which it applied. The error was harmless.

B

Finally, defendant argues the trial court "failed to recognize its discretion to sentence the sexual intercourse convictions . . . and the lewd acts convictions that weren't stayed . . . concurrently instead of consecutively." The Attorney General agrees as to the lewd conduct convictions.[7]

Section 667.61, subdivision (i) provides: "For any offense specified in paragraphs (1) to (7), inclusive, of subdivision (c), or in paragraphs (1) to (6), inclusive, of subdivision (n), the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6." These offenses are: "(1) Rape, in violation of paragraph (2) or (6) of subdivision (a) of Section 261. [¶] (2) Rape, in violation of paragraph (1) or (4) of subdivision (a) of former Section 262. [¶] (3) Rape or sexual penetration, in concert, in violation of Section 264.1. [¶] (4) Lewd or lascivious act, in violation of subdivision (b) of

---

[7] With respect to defendant's sexual intercourse convictions, the Attorney General notes that defendant was sentenced to terms of 25 years to life, not because of the one strike law, but because section 288.7, subdivision (a) requires that term of imprisonment. While true, the provision does not require the trial court to impose consecutive terms of imprisonment. For the reasons we explain *post*, the trial court did not distinguish between these convictions and the other convictions when imposing consecutive sentences. Instead, it appeared to believe the one strike law required consecutive sentences for all of them.

Section 288.  [¶]  (5) Sexual penetration, in violation of subdivision (a) of Section 289.  [¶]  (6) Sodomy, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 286.  [¶]  (7) Oral copulation, in violation of paragraph (2) or (3) of subdivision (c), or subdivision (d), of Section 287 or former Section 288a." (§ 667.61, subd. (c); see also § 667.61, subd. (n)(1)-(6).)  Defendant was not convicted of any of these offenses.

The probation report recommended consecutive sentences for defendant's crimes based on the factors set forth in California Rules of Court, rule 4.425, without mentioning section 667.61, subdivision (i).  At the sentencing hearing, the prosecution argued for consecutive sentences while impliedly acknowledging concurrent sentences were a possibility if the trial court were inclined to grant defendant some leniency.  However, defense counsel stated:  "What [the prosecution] is saying regarding a recommendation and concurrent time, in my reading of the law, I don't think the Court has any–even if the Court wanted to exercise discretion, I don't think the Court can."  The trial court agreed stating, "[t]he only way this could be concurrent would be if I were to find that one or more of these offenses that occurred against [the daughter] were perpetrated on the same day, but I'm not making that finding."  After explaining that the crimes committed against the daughter were alleged and proved to have been committed on separate occasions, the trial court concluded, "it would be an error for me not to impose consecutive sentencing, and I don't think you would have an argument to do otherwise."

Before imposing defendant's sentence, the trial court stated:  "So I am going to absolutely follow the Probation Department's recommendations.  Actually, it's what the law requires[.]"  The trial court imposed consecutive sentences on all counts that were not stayed pursuant to section 654.  Regarding the reason for imposing consecutive sentences, the trial court stated:  "I incorporate by reference my earlier colloquy between myself and [defense counsel] with respect to why I am imposing consecutively in this case."

Because defendant was not convicted of any of the crimes specified in section 667.61, subdivision (i), consecutive sentencing was discretionary, not mandatory. (*People v. Lopez* (2022) 76 Cal.App.5th 287, 291.)  However, as the Attorney General notes, the trial court "appeared to believe that consecutive sentences were mandated by [this provision]."  " 'It is axiomatic that when an issue entrusted to the trial court's discretion is properly presented to the court for decision, the court must *exercise* its discretion:  In such a case a statement or other evidence that the court believes it has no discretion, but must rule in a certain way, indicates an error so fundamental as to be said to amount to a refusal to exercise jurisdiction.'  [Citation.]" (*People v. Bolian* (2014) 231 Cal.App.4th 1415, 1421.)  "Because the trial court may not have recognized it had discretion to impose concurrent or consecutive sentences on [defendant's] convictions . . . remand is appropriate to allow the trial court to exercise that discretion. On remand, the court must state its reasons for imposing either concurrent or consecutive sentences." (*Lopez*, at p. 294; see Cal. Rules of Court, rule 4.406(b).)  We shall therefore vacate defendant's sentence and remand the matter for a new sentencing hearing.[8]

---

[8] This conclusion makes it unnecessary to address whether or not the sentence originally imposed amounted to cruel and/or unusual punishment in violation of the federal or California Constitutions.  This court's original opinion in this matter also declined to address whether the trial court violated the Sixth and Fourteenth Amendments by imposing consecutive terms for the crimes committed against the daughter, noting that a similar issue was then pending before the California Supreme Court.  We now note that the Supreme Court resolved that issue against the defendant in *People v. Catarino* (2023) 14 Cal.5th 748, at pages 755-757.  Finally, defendant argues he is entitled to retroactive application of Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441).  On remand, defendant may assert his entitlement to the benefit of this change in the law. (See *People v. Mani* (2022) 74 Cal.App.5th 343, 351.)  We express no opinion on the matter.

## DISPOSITION

The sentence is vacated, and the matter is remanded to the trial court for a new sentencing hearing, during which the trial court shall (1) exercise its discretion in imposing either consecutive or concurrent terms of imprisonment, stating reasons for that sentencing choice; and (2) prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

/S/

MAURO, J.

We concur:

/S/

HULL, Acting P. J.

/S/

RENNER, J.